UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

RYAN COURTADE,

        Petitioner,

                                      CIVIL NO. 2:16cv736
v.                         [ORIGINAL CRIMINAL NO. 2:15cr29]

UNITED STATES OF AMERICA,

        Respondent.

## OPINION

This matter is before the court on the Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("Motion"), and incorporated Memorandum, filed by counsel on December 22, 2016. ECF No. 51. The court issued an order requiring the government to respond on January 18, 2017. ECF No. 53. Subsequently, the United States sought discovery from the Petitioner's former counsel. ECF No. 54. That motion was granted in accordance with the protective order issued in the court's Memorandum Order of March 20, 2017. ECF No. 66. The affidavits of the Petitioner's former counsel, with attached exhibits, were filed under seal on April 19, 2017. ECF Nos. 71, 72.

The United States filed a Response in Opposition to the Motion on May 19, 2017. ECF No. 76. The Petitioner filed his Reply on June 5, 2017. ECF No. 79. On July 20, 2017, the court

ordered the United States to file, under seal, the original video at issue in this case, so that the court could conduct an in camera review of the video. ECF No. 82. On July 28, 2017, the court granted the Petitioner's request for an evidentiary hearing. ECF No. 84. On October 16, 2017, prior to the evidentiary hearing, the Petitioner filed a letter that included supplemental authority for the court's consideration. ECF No. 88. At the evidentiary hearing on October 17, 2017, the court set a deadline at October 20, 2017, at 5:00 P.M., for the parties to file any additional materials for the court to consider. ECF No. 89. On the evening of October 20, 2017, the Petitioner filed Proposed Findings of Fact and Conclusions of Law. ECF No. 90. The Motion is now ripe for review.

## I. FACTUAL AND PROCEDURAL HISTORY

On May 20, 2015, a grand jury returned a two-count Superseding Indictment against the Petitioner. Count One charged the Petitioner with Production of Child Pornography, in violation of 18 U.S.C. §§ 2251(a), (e) and 2256(2). ECF No. 13 at 1. Count Two charged the Petitioner with Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). Id. at 2. On August 25, 2015, the Petitioner, appearing with counsel, pleaded guilty to Count Two. ECF Nos. 26, 27. The Petitioner, under oath, and the government agreed to a

2

"Statement of Facts," which described the following foundations for the Petitioner's guilty plea:

On August 5, 2014, the Petitioner was found in the bedroom of Jane Doe, a young teenager, kneeling by her bed with his hands underneath the sheets. Statement of Facts ¶ 3, ECF No. 28. Jane Doe was asleep at the time. Id. When local police arrived on the scene, they found the Petitioner in his car, breaking a CD. Id. ¶ 4. When questioned about the contents of the CD, the Petitioner informed the police that it was a video of Jane Doe naked and in the shower, made with a GoPro video camera belonging to the United States Navy. Id. The Petitioner "stated he had Jane Doe take the camera in the shower to see if the camera was waterproof." Id. A forensic review of the Petitioner's computer revealed a twenty-four minute video of Jane Doe. Id. ¶ 6.

> In the video, COURTADE is seen turning on the video camera and then placing the camera on the bathroom counter facing the shower with Jane Doe in view. COURTADE talks to Jane Doe and then leaves. Jane Doe undresses completely, gets in the shower, closes the shower curtain, and turns on the shower. Jane Doe then calls for COURTADE, who comes back into the bathroom, hands her the camera over the shower rod, and Jane Doe runs the camera under the water for a little while. Jane Doe hands the camera back to COURTADE, COURTADE reviews the camera, and hands the camera back to Jane Doe and tells her to put it on the floor of the shower. Jane Doe follows the instruction, and then gives it back to COURTADE. COURTADE then places the camera, still on, back on the counter of the bathroom facing the shower and exits the bathroom. Jane Doe peeks out at the camera a few times, then gets out at

3

the far end of the shower, drops to the floor, and crawls out of the view of the camera below the countertop. Jane Doe reappears on the other side of the camera's view, dries off, gets dressed and exits the bathroom. During the video, Jane Doe's breasts and genitals are visible at various points.

Id. In the Plea Agreement, which the Petitioner signed and confirmed under oath at the plea agreement hearing, ECF No. 26, he stated that he (1) "will plead guilty because [he] is in fact guilty of the charged offense," (2) "admits the facts set forth in the statement of facts filed with this plea agreement[,] and [(3)] agrees that those facts establish guilt of the offense charged beyond a reasonable doubt." Plea Agreement ¶ 3, ECF No. 27.

The Petitioner also attached a transcript of the audio from the video to his Motion as Exhibit 3:

### Beginning

{COURTADE starts video, showing his face. He places it on the bathroom counter facing the shower, the wide angle lens shows the entire bathroom. He says something here that is covered by noise from movement.}

### :11 to :39

COURTADE: Unclear until "... this is off, [unclear], can't record you. You want to take this out and do this myself I will. It's all up to you. You cool?

VIC: Yeah.

COURTADE: So just holler at me in a minute, when you get in the shower, gonna hand it to you, can you do that?

4

VIC: 'Kay.

COURTADE: [unclear due to VIC tapping on counter] You cool?

VIC: Um-hm.

COURTADE: You gonna need a minute, or you need to use the bathroom?

VIC: I just need a minute.

COURTADE: Okay.

{COURTADE exits bathroom, shutting door. From :40 to 1:44, VIC undresses, starts water, turns on shower, and gets in}

1:46 to 2:47

VIC: [sealed][1]

COURTADE: (through door) You ready?

VIC: Yeah!

COURTADE: Ready?

VIC: Yeah!

{COURTADE reenters bathroom}

COURTADE: You good?

VIC: Yeah.

{COURTADE picks up camera, hands it over shower curtain to VIC}

COURTADE: So if you hold it like right in front of you, and hold it under the water for a few minutes, then hand it back to me, so I can make sure no water's getting into it ...

---

[1] For privacy purposes, the victim's remark is placed under seal and attached hereto as Exhibit A.

VIC: Okay.

COURTADE: then just (garbled by noise) ... off ...
hold it like arm's length in front of you ...(garbled
by noise) ... so the back is away from you ...
(garbled)

{VIC takes camera and puts it under the shower spray,
gives it back.}

3:39 to 4:20

COURTADE: Yeah. I'm going to be over here for a
second ... { } Alright, it looks good. Doesn't look
like any water's getting in there. {hands it back to
VIC over curtain} Got it?

VIC: Yeah.

COURTADE: You need to set it back down on the floor
there. {VIC puts camera on floor of shower, pointing
up at her as she washes}

VIC: Like that? (barely audible over shower hitting
camera)

(Shower runs over camera from 4:20 until 9:37)

9:37 to

VIC: (garbled by noise)

COURTADE: What's that?

VIC: (garbled by noise)

COURTADE: (garbled by noise) Will you, rinse it off?

VIC: Okay.

9:55 to 11:03

COURTADE: Hold it .... Out in front of you ... just a
little bit ... (garbled) .... There.

10:10 begins tapping on the video recorder repeatedly, COURTADE speaks but is garbled until he says "There. Alright."

10:25
COURTADE: you ahhhh.... (garbled from brushing/tapping noises)

VIC: Yeah?

COURTADE: (garbled)

VIC: yeah.

COURTADE: (garbled) .... I have a surprise waiting for you downstairs.

VIC: (garbled)

COURTADE: It starts with i.c.e ....

VIC: i. c. e. ?

COURTADE: i.c.e.? What has i.c.e.c.r.e.a.m. in it?

VIC: Ice cream?

COURTADE: no.

VIC: (giggles) heehee, yeah.

(pause)

COURTADE: (unable hear name)

VIC: Ummhummm?

COURTADE: Hurry up, please.

VIC: Okay.

{COURTADE leaves at 11:04. No further dialog[ue].)

Mot. Ex. 3, ECF No. 51-1.

7

On December 18, 2015, the Petitioner was sentenced to one hundred twenty (120) months imprisonment. ECF No. 47. The Judgment was entered on December 21, 2015. ECF No. 48. The Petitioner did not appeal.

## II. **LEGAL STANDARDS**

A prisoner may challenge a sentence imposed by a federal court, if (1) the sentence violates the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A sentence is "otherwise subject to collateral attack," if a petitioner shows that the proceedings suffered from "a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979) (quoting Hill v. United States, 368 U.S. 424, 428 (1962) (internal quotation marks omitted)). If the Petitioner is successful in making such a showing, the court may vacate, set aside, or correct the sentence. See 28 U.S.C. § 2255(b). However, if the motion, when viewed against the record, shows that the petitioner is entitled to no relief, the court may summarily deny the motion. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

Further, once a defendant has waived or exhausted his appeals, the court is "entitled to presume he stands fairly and

8

finally convicted." United States v. Frady, 456 U.S. 152, 164 (1982). Under the doctrine of procedural default, claims asserting errors, of fact or law,

> that could have been, but were not raised on direct appeal are barred from review under § 2255, unless the defendant [(1)] shows cause for the default and actual prejudice resulting from such errors or [(2)] demonstrates that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack.

United States v. Shelton, No. 1:04cr45, 2009 WL 90119, at *1 (W.D. Va. Jan. 14, 2009) (citing United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999)); see also Frady, 456 U.S. at 167-68. If alleging cause and prejudice, both must be present, and the absence of either is sufficient to deny the petitioner relief. See id. at 168 ("[W]e find it unnecessary to determine whether [the petitioner] has shown cause, because we are confident he suffered no actual prejudice."). Cause "must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." Mikalajunas, 186 F.3d at 493 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)). Prejudice cannot be "merely that the errors at [the] trial created a possibility of prejudice, but that they worked to [the petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170 (emphasis in original).

9

Alternatively, if alleging that "a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence." Mikalajunas, 186 F.3d at 493 (citing Murray, 477 U.S. at 496). "To establish actual innocence, [the] petitioner must demonstrate that 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.'" Bousley v. United States, 523 U.S. 614, 623 (1998) (quoting Schlup v. Delo, 513 U.S. 298, 327-28 (1995)). Because "'actual innocence' means factual innocence, not mere legal insufficiency," Bousley, 523 U.S. at 623, and "resolving [actual innocence] claims on an artificially restricted record would eviscerate the critical systemic interest in finality," United States v. Fugit, 703 F.3d 248, 257 (4th Cir. 2012), the court is not limited to the stipulated facts that typically accompany a plea agreement or colloquy. Rather, the court can look to the entire universe of admissible evidence. See Bousley, 523 U.S. at 624 (stating the government can "present any admissible evidence of [the] petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy"); Schlup, 513 U.S. at 328 (stating that "[t]he habeas court must make its determination concerning the petitioner's innocence in light of all of the evidence . . . " (internal quotation marks and citation omitted)); Fugit, 703 F.3d at 256-58 (reasoning

10

that facts contained in a presentence report, conceded to by the defendant in open court and used by the trial judge as the basis for sentencing, are firmly within the realm of admissible evidence).

## III. ANALYSIS

The Petitioner alleges five grounds for relief in his Motion:[2]

Ground One: the charged conduct is not criminal under 18 U.S.C. § 2252(a)(4)(B), because the video at issue in the indictment does not show a minor engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

Ground Two: the Petitioner's guilty plea was not voluntary and intelligent, because the Petitioner did not understand that the conduct to which he pleaded guilty was not criminal;

Ground Three: the District Court did not properly determine the factual basis for the Petitioner's guilty plea, as required by Rule 11 of the Federal Rules of Criminal Procedure;

Ground Four: the Petitioner's counsel provided ineffective assistance by advising him to plead guilty without informing him that his conduct was not criminal under the applicable statute;

Ground Five: the Petitioner's counsel provided ineffective assistance by failing to consult with him regarding whether to file an appeal.

Mot. at 4-10, 23-45. At the evidentiary hearing on October 17, 2017, ECF No. 89, the Petitioner withdrew Ground Four. See Proposed Findings of Fact and Conclusions of Law at 1 n.1, ECF No. 90. However, to the extent that Ground Four relates to, or

---

[2] For clarity, the Petitioner's Ground Four claiming ineffective assistance of counsel has been split into two separate grounds, for purposes of this Opinion.

11

relies on, the Petitioner's other claims, the court will
consider it.

The United States argues that Grounds One, Two, and Three
are procedurally defaulted, as the Petitioner could have raised
them on direct appeal but did not. See Resp. at 9-12, ECF
No. 76; see also Mikalajunas, 186 F.3d at 492-93; Frady, 456
U.S. at 167-68. The Petitioner argues that he can demonstrate
"actual innocence" to overcome this default. Mot. at 4, 24.
Therefore, the court must first determine whether Grounds One,
Two, and Three are procedurally defaulted, or whether the
Petitioner can successfully claim actual innocence.

### A. Actual Innocence of Charged Conduct

The crime to which the Petitioner pleaded guilty provides
for the punishment of any person who

> knowingly possesses . . . 1 or more books, magazines,
> periodicals, films, video tapes, or other matter which
> contain any visual depiction that has been mailed, or
> has been shipped or transported using any means or
> facility of interstate or foreign commerce or in or
> affecting interstate or foreign commerce, or which was
> produced using materials which have been mailed or so
> shipped or transported, by any means including by
> computer, if—
>     (i) the producing of such visual depiction
> involves the use of a minor engaging in sexually
> explicit conduct; and
>     (ii) such visual depiction is of such conduct[.]

18 U.S.C. § 2252(a)(4)(B). The Petitioner argues that he is
"actually innocent" of this crime because the video of Jane Doe
does not show her engaging in "sexually explicit conduct," as

12

that term is defined in 18 U.S.C. § 2256(2)(A). Mot. at 4, 25, 31-34. Pursuant to 18 U.S.C. § 2256(2)(A), "sexually explicit conduct" is defined as "(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person[.]" 18 U.S.C. § 2256(2)(A). Neither party has argued that subsections (i)-(iv) apply in this case. Accordingly, the precise inquiry here is whether the video of Jane Doe naked and in the shower depicts a "lascivious exhibition of the genitals or pubic area."[3]

## 1. Legal Parameters of the Inquiry

To the court's knowledge, there are no cases in which the United States Court of Appeals for the Fourth Circuit has interpreted "lascivious" for the purpose of determining whether a particular visual depiction meets the statutory definition set out in § 2256(2)(A)(v). The Petitioner argues that a "lascivious exhibition of the genitals or pubic area" requires sexual behavior or suggestiveness by the child depicted, either through dress or pose, and that mere nudity in the shower, "where one is expected to be naked on a daily basis as a matter of course," is

_____

[3] The Petitioner does not contest that the video shows Jane Doe's pubic area. Mot. at 16, 31 & n.2; Reply at 10 nn. 4-5.

13

insufficient to support a finding of lasciviousness. Mot. at 30-32. For the reasons below, the court disagrees with the Petitioner's interpretation.

"'[L]ascivious' is a 'commonsensical term.'" United States v. Whorley, 400 F. Supp. 2d 880, 884 (E.D. Va. 2005) (quoting United States v. Arvin, 900 F.2d 1385, 1390 (9th Cir. 1990)). Courts, including district courts within the Fourth Circuit, have primarily looked to the six "Dost factors" as guideposts for the "commonsensical" inquiry into whether a particular visual depiction is "lascivious." See, e.g., Whorley, 400 F. Supp. 2d at 883-84 (determining the Dost factors were relevant, but not controlling, to the lascivious question, and rejecting expert testimony on "whether an image is lascivious," as "'lascivious' is a 'commonsensical term'" (quoting Arvin, 900 F.2d at 1390)). The Dost factors are:

1) whether the focal point of the visual depiction is the child's genitalia or pubic area;

2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and

14

> 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

_Whorley_, 400 F. Supp. 2d at 883 (citing _United States v. Dost_, 636 F. Supp. 828, 832 (S.D. Cal. 1986), _aff'd sub nom. United States v. Wiegand_, 812 F.2d 1239 (9th Cir. 1987)).

The _Dost_ factors are neither exhaustive nor controlling on the question of whether a depiction is lascivious. Further, no one factor is outcome-determinative, nor do all the factors need to be present for a finding of lasciviousness. See _Whorley_, 400 F. Supp. 2d at 883 (quoting cautionary language from _Dost_, 636 F. Supp. at 832).[4] The courts that have adopted, or otherwise endorsed or allowed the use of, the _Dost_ factors have all followed this comprehensive approach. See _United States v. Wells_, 843 F.3d 1251, 1253-54 (10th Cir. 2016); _United States v. McCall_, 833 F.3d 560, 563 (5th Cir. 2016); _United States v. Russell_, 662 F.3d 831, 843 (7th Cir. 2011); _United States v. Larkin_, 629 F.3d 177, 182 (3d Cir. 2010); _United States v. Brown_, 579 F.3d 672, 680 (6th Cir. 2009); _United States v. Rivera_, 546 F.3d 245, 249-50 (2d Cir. 2008); _United States v. Hill_, 459 F.3d 966, 972 (9th Cir. 2006); _United States v._

---

[4] In fact, the court in _Dost_ stated from the outset that "the 'lascivious exhibition' determination must be made on a case-by-case basis using general principles as guides for analysis," and that "the trier of fact should look to the [] factors, among any others that may be relevant in the particular case." 636 F. Supp. at 832 (emphasis added).

Frabizio, 459 F.3d 80, 87-88 (1st Cir. 2006); United States v. Horn, 187 F.3d 781, 789 (8th Cir. 1999).

The Petitioner argues that the application of the Dost factors to this case weighs against a finding of lasciviousness. In making this argument, he urges this court to disregard the sixth Dost factor—the intended effect of the visual depiction on the viewer—and to further adopt a requirement that the depiction contain an affirmative sexual act by the minor. Mot. at 33-34.

However, "children typically are not mature enough to project sexuality consciously." Russell, 662 F.3d at 844 (citing Arvin, 900 F.2d at 1391); see also Frabizio, 459 F.3d at 89. Requiring "the child subject [to] exhibit sexual coyness in order for an image to be lascivious . . . r[uns] the risk of limiting the statute." Id.; see also Wiegand, 812 F.2d at 1244 (critiquing the district court's focus on whether the child appeared willing to engage in sexual activity, as "over-generous to the defendant," because it "impl[ied] . . . that the pictures would not be lascivious unless they showed sexual activity or willingness to engage in it"). Thus, many courts have held that a child is not required to demonstrate sexual invitation or coyness in pose, dress, or manner for a visual depiction of the child to be lascivious. E.g., United States v. Wolf, 890 F.2d 241, 247 (10th Cir. 1989). Nor is the child depicted required to

affirmatively commit a sexual act for a visual depiction to be lascivious. See McCall, 833 F.3d at 564 (rejecting the defendant's argument that, to be a "lascivious exhibition," a "surreptitious recording . . . requires an affirmative display or sexual act by a minor"); United States v. Holmes, 814 F.3d 1246, 1252 (11th Cir. 2016), cert. denied, 137 S. Ct. 294 (2016) ("Today, we join the Eighth, Ninth, and Tenth Circuits and hold that a lascivious exhibition may be created by an individual who surreptitiously videos or photographs a minor . . . even when the original depiction is one of an innocent child acting innocently.").

Instead, as the Ninth Circuit has held, "[w]here children are photographed, the sexuality of the depictions often is imposed upon them by the attitude of the viewer or photographer." Arvin, 900 F.2d at 1391. Put differently, "lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or likeminded pedophiles." Wiegand, 812 F.2d at 1244. "The motive of the photographer in taking the pictures therefore may be a factor which informs the meaning of 'lascivious.'" Arvin, 900 F.2d at 1391.

Other courts have followed the Ninth Circuit, and held that the intent of the visual depiction's creator can be considered

17

in determining whether a visual depiction is a "lascivious exhibition." See, e.g., Russell, 662 F.3d at 844 ("[I]t is often the photographer who stages the picture in such a way as to make it sexually suggestive." (citing Arvin, 900 F.2d at 1391)). The producer's intent can be determined from his actions in arranging the composition, lighting, content, angle or focus of the camera lens, et cetera, in pre- and/or post-production. See Wells, 843 F.3d at 1256 ("By the location and angle at which [the defendant] positioned the camera, [the child's] pubic area was exposed never more than a few feet from the camera's prying lens. The jury reasonably could have concluded that [the defendant] intended to film [the child's] pubic area or genitals."); Holmes, 814 F.3d at 1252 ("[A] reasonable jury could have found that [the defendant's] conduct—including placement of the cameras in the bathroom where his stepdaughter was most likely to be videoed while nude, his extensive focus on videoing and capturing images of her pubic area, the angle of the camera set up, and his editing of the videos at issue—was sufficient to create a lascivious exhibition of the genitals or pubic area."); United States v. Schuster, 706 F.3d 800, 807 (7th Cir. 2013) (affirming the lower court's finding that an image was lascivious based on "the photo's failure to show the boy's whole body, and the resulting focus on the genitals"); Larkin, 629 F.3d at 183-84 (discussing the ways in which the defendant

18

composed and framed photographs of nude children to find that the intended effect of the photographs was to arouse the viewer, and thus that the images were lascivious); Horn, 187 F.3d at 790 ("By focusing the viewer's attention on the pubic area, freeze-framing can create an image intended to elicit a sexual response in the viewer."); Wiegand, 812 F.2d at 1244 ("It was a lascivious exhibition," when the photos at issue focused on the child's genitalia, "because the photographer arrayed it to suit his peculiar lust.").

Further, the inquiry into the producer's intent is not limited to the "four corners" of the depiction. Courts have also considered evidence of other, related conduct to make determinations regarding the producer's intent, including the context surrounding the creation, acquisition, and/or use of a visual depiction. E.g., Larkin, 629 F.3d at 184 (relying on producer's having trafficked a photo at issue to a pedophile to determine that she "designed the image depicted . . . to arouse"); Russell, 662 F.3d at 842-48 (upholding the district court's allowance of the government to introduce evidence of molestation to support the argument that the defendant intended to create sexually provocative photographs of his daughters); see also Frabizio, 459 F.3d at 89-90 (rejecting a "four corners rule" for determining the lasciviousness of a depiction, and stating that "the text of the statute itself does not require"

19

such a rule). The relevance of such external evidence to "a defendant's motive and intent will turn on the facts of the case." Russell, 662 F.3d at 844. However, external evidence of motive and intent may be most relevant when "there is evidence that the photographer posed the minor in such [a] way that her genitals are visible but has disclaimed any intent to create a sexually suggestive image." Id.

It is important to note that this inquiry regarding a defendant's intent does not bring private fantasies "within the statute's ambit." Wiegand, 812 F.2d at 1245. Rather, the inquiry focuses on the visual depiction's intended effect, as opposed to its actual effect, on the viewer. Larkin, 629 F.3d at 184 (discussing Wiegand and the necessary limitations of an inquiry into the defendant's intent) (citing United States v. Villard, 885 F.2d 117, 125 (1989)). Additionally, the intent inquiry can be more helpful, and raise fewer constitutional concerns, in cases involving production of child pornography, as opposed to solely possession of child pornography. See Rivera, 546 F.3d at 251-52 (discussing the sixth Dost factor and its greater relevance in production, as opposed to possession, cases). Therefore, an inquiry into the Petitioner's intent is relevant, but not dispositive, evidence in determining whether the video in this case is "lascivious," pursuant to 18 U.S.C.

§ 2256(2)(A)(v), and thus whether the Petitioner was properly convicted of Possession of Child Pornography.

## 2. The Video

Having thus defined the parameters of the inquiry, the court now turns to the question of the Petitioner's factual innocence.[5] In order to prevail, the Petitioner must prove that, based on the video in question, "it is more likely than not that no reasonable juror would have convicted him" of violating 18 U.S.C. § 2252(a)(4)(B). See Schlup, 513 U.S. at 327. The Petitioner fails to make this showing.

The video shows Jane Doe nude. Statement of Facts ¶¶ 4, 6. Her breasts and pubic area are visible at various times in the

---

[5] In conducting this analysis, the court relies on the facts stipulated to in the Statement of Facts; the transcript of the video's audio provided by the Petitioner as an exhibit to his Motion; the Petitioner's descriptions of the contents of the video, contained in his Motion and Reply; and the court's independent evaluation of the video, after it was provided pursuant to the court's Order of July 20, 2017, ECF No. 82, and reviewed in camera. The United States discusses additional facts contained in the Petitioner's presentence report, see Resp. at 1-3, and such facts may appropriately be considered here in determining the Petitioner's factual innocence, see Bousley, 523 U.S. at 624 (stating the government can "present any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy"); Fugit, 703 F.3d at 251-52, 256-58 (relying on Bousley to consider additional facts contained in the presentence report, which the petitioner affirmed to be error-free during sentencing). However, the court finds that the Statement of Facts, the audio transcript, the Petitioner's descriptions, and its own evaluation are sufficient to resolve the question at hand—whether the video of Jane Doe naked and in the shower contains a "lascivious exhibition of the genitals or pubic area."

21

video. Id. ¶ 6; Mot. at 16, 31. The Petitioner first positions the camera on the bathroom vanity, near waist level, so that the lens faces the shower. Mot. Ex. 3 at 2. This position, in combination with the wide-angle lens of the camera, allows the camera to capture the entire length of the bathroom, ensuring that Jane Doe undressing and entering the shower will be recorded. The Petitioner then exits the bathroom.

After Jane Doe enters the shower and turns it on, the Petitioner comes back in the bathroom and hands her the camera over the shower rod. Id. at 3. During this exchange, the Petitioner points the camera lens down toward Jane Doe, thereby recording her entire nude body. When Jane Doe initially holds the camera, it appears to only capture the bathroom wall. The Petitioner then directs Jane Doe to "hold it like arm's length in front of you . . . so the back is away from you." Id. at 3 (emphasis added). Directing Jane Doe to position the camera so the "back is away from [her]" ensures that the camera lens faces and records Jane Doe's nude body. When Jane Doe moves the camera, per the Petitioner's instructions, she records images of her breasts and pubic area.

The Petitioner then directs Jane Doe to "set [the camera] back down on the floor there," and she complies. Id. The audio transcript and video indicate that Jane Doe asks, "Like that?" after setting the camera down on the shower floor, with the lens

22

pointing up. Id.[6] For much of the time the camera is in this position, Jane Doe sits next to it on the shower floor, seemingly to avoid being recorded. However, while the camera is angled upward in this manner, it records images of Jane Doe's breasts and pubic area while she is standing.

Finally, when the Petitioner takes the camera back from Jane Doe for the last time,[7] he sets it back on the vanity, facing the shower. Statement of Facts ¶ 6. The Petitioner then spends time adjusting the camera's position on the vanity. When the wide-angle lens is again able to capture the entire length of the bathroom, the Petitioner leaves the camera turned on and exits. Id. This positioning again ensures that the camera will record Jane Doe's entire body as she exits the shower, towels off, and dresses.[8] At several points during the remainder of the

---

[6] This suggests that the Petitioner may have made a request to position the camera in that specific manner. However, based upon the in camera review, the court cannot confirm whether the Petitioner made a request regarding the camera's positioning on the floor. If any such request was made by the Petitioner, it is inaudible.

[7] As already explained in text, the camera is passed between the Petitioner and Jane Doe over the shower rod several times during the video. Each time the camera is passed over the shower rod, the Petitioner angles the lens down toward Jane Doe, recording images of her entire nude body.

[8] The court notes that the camera remains on after being meticulously positioned by the Petitioner, even though the Petitioner's excuse for having the camera in the shower with Jane Doe, that he's testing whether it is waterproof, has ended. See Mot. at 4, 14-16, 31, 34 (stating that, in making the video,

23

video, Jane Doe peers around the edge of the shower curtain at the camera and stares at it. Id. She then adjusts the shower curtain, pressing it flush against the shower wall, as if making sure it cannot record her inside the shower.[9] When Jane Doe exits the shower, she drops to the ground and crawls across the bathroom floor to the other side of the room, before standing to dry off and dress. Id. This maneuver suggests that she is not aware that the edges of the bathroom are within the camera's view. However, while standing to dry off and dress, her entire nude body is recorded.

### 3. Conclusion Re Video

Jane Doe appears fully nude for large portions of the video, and she can be seen undressing, showering, and dressing. That the camera was not zoomed so as to capture close-ups of Jane Doe's genitals or pubic area does not help the Petitioner, as he argues. See Mot. at 31-32, 32 n.3. In Wells, the Tenth Circuit determined that it was not necessary for the defendant to have "edit[ed] the videos, freeze-frame[d] particular images from them, or zoom[ed] in on [the victim]." 843 F.3d at 1256. Instead, "[b]y the location and angle at which [he] positioned the camera, [the victim's] pubic area was exposed never more

---

the Petitioner was merely testing whether the camera was waterproof).

[9] The shower curtain is opaque, so when the camera is on the vanity, it cannot record any images from inside the shower.

24

than a few feet from the camera's prying lens." Id. In this case, the Petitioner carefully positioned the camera on the bathroom vanity at the start and in the middle of the video. His selection of a camera with a "wide angle lens," capable of showing the entire bathroom when positioned on the vanity, see e.g., Mot. Ex. 3 at 2, maximized the likelihood that any images of Jane Doe would include her pubic area and breasts. He gave directions to Jane Doe regarding how to position and hold the camera, ensuring that the camera recorded her nude body. He also angled the camera lens down while it was above Jane Doe's head, so as to record her entire body. Such intentional positioning of the camera and composition of the video weigh against the Petitioner in deciding whether the video constitutes a "lascivious exhibition." See Wells, 843 F.3d at 1256 (finding that "the location and angle at which [the defendant] positioned the camera," supported a conclusion that the defendant "intended to film [the minor's] pubic area or genitals"); Holmes, 814 F.3d at 1252 (finding that the placement of the cameras and the angle of the camera set up helped support a finding of lasciviousness).

The Petitioner further argues that Jane Doe's nudity in the bathroom is innocent, as people are normally naked when they are in the shower. Mot. at 32. However, this shower involves a young teenager, not in the bathroom alone while taking a shower, and

she is being told that she is to test a camera to see if it is waterproof. The Petitioner also argues that the shower is not a place commonly associated with sexual activity. Id. However, as other courts have recognized, "'showers and bathtubs are frequent hosts to fantasy sexual encounters as portrayed on television and in film,' such that a bathroom 'is potentially as much of a setting for fantasy sexual activity as is an adult's bedroom.'" Wells, 843 F.3d at 1256 (quoting Larkin, 629 F.3d at 177). Thus, that the video is set in a bathroom, and specifically in a shower, can be highly sexually suggestive. The Petitioner's attempt to make his choice of location for the video appear innocent is ineffective.

Further, Jane Doe's nudity and her decision to take a shower were not entirely of her own volition. The Petitioner's manipulation of Jane Doe in creating this video also counters his argument that Jane Doe's nudity and the video's setting are innocent. The Petitioner asked Jane Doe to take a shower so he could "test" whether his camera was waterproof. Mot. at 4, 14-16, 31, 34. This manipulation to get her into the shower indicates that this is not normal or innocent behavior. See Mot. Ex. 3 (repeatedly asking Jane Doe if she was "cool with it" and saying that if she wasn't, he could do it). His promise of ice cream to her near the middle of the video underscores that manipulation and undermines his claim that this conduct is

innocent. Id. at 4. Finally, he lies to her, stating that the camera is off and "can't record you." Id. at 2. This lie about whether he is recording at all further diminishes the possibility that the conduct captured in the video is innocent.

Additionally, Jane Doe's attempts to hide her nudity demonstrate her reluctance to be naked in front of the camera. Her discomfort underscores that this video does not depict innocent conduct. First, Jane Doe stares out from around the edge of the shower curtain at several points in the video. Statement of Facts ¶ 6. Seeing the camera's continued presence appears to unnerve her, evidenced by her repeatedly readjusting the shower curtain to ensure that it blocks the camera's view. Upon exiting the shower, Jane Doe drops to the ground and crawls across the floor to reach the other side of the bathroom before drying off and dressing. Id. This maneuver suggests that Jane Doe is unaware that even the edges of the bathroom are still within view of the camera's wide-angle lens. Such behavior further demonstrates her reluctance and discomfort with being nude in front of the camera. This is antithetical to a family photo or home video capturing children at play in the bath, where a child might easily and willingly smile up at the camera. Jane Doe's behavior suggests very different, and disturbing, circumstances. Therefore, given the Petitioner's manipulation of Jane Doe and her corresponding reluctance to be recorded, a jury

could have reasonably found that the shower was a sexually suggestive setting and that the behavior depicted in the video was not innocent. See Wells, 843 F.3d at 1256.

Next, the Petitioner insists that he had no sexual motive for producing and possessing the video. See Mot. at 31-34. However, the Petitioner also seems to argue that his actions were closer to those of a video voyeur. See id. at 28-29 (comparing voyeurism cases to child pornography cases). This court disagrees with both of those assertions. As the Fifth Circuit recognized in United States v. Steen, "[w]hen a photographer selects and positions his subjects, it is quite a different matter from the peeking of a voyeur upon an unaware subject pursuing activities unrelated to sex." 634 F.3d 822, 828 (5th Cir. 2011); see also Rivera, 546 F.3d at 250. Here, the Petitioner acted as more than a video voyeur. He was responsible for the mise-en-scéne: he selected the setting (the bathroom), the activity (taking a shower), and the child (Jane Doe). His own positioning of the camera, coupled with his directions to Jane Doe regarding the camera's position, evidence an intent to capture the images he desired of her nudity. His manipulation to get her into the shower, as well as the promise of ice cream as a reward, emphasize the exploitative nature of their relationship. See Mot. Ex. 3. Thus, counter to the Petitioner's arguments, this case presents more than mere nudity in the

28

bathroom. This video does not reflect the behavior of a man merely testing the waterproof nature of a camera.[10] Rather, this is exactly the kind of child abuse and exploitation that Congress aimed to punish when it passed the statute under which the Petitioner was convicted. See, e.g., S. Rep. No. 95-438, at 9-11 (1977) (explaining that federal law "aimed at eradicating this form of child abuse," that "is inherent in the production" of child pornography is necessary).

Finally, the Petitioner's possession of this video came to light after he was found in Jane Doe's bedroom, with his hands under her bedsheets, while she was asleep. Statement of Facts ¶ 3. The factual context surrounding the discovery of the video significantly undermines the Petitioner's claim that he was merely testing the waterproof nature of the camera. Therefore, a reasonable jury could find that the Petitioner intended the video to elicit a sexual response in the viewer—himself and others like-minded. See Rivera, 546 F.3d at 250; Wiegand, 812 F.2d at 1244.

It is important to note that the relevance of whether the video was intended or designed to elicit a sexual response in the viewer (the sixth Dost factor) is contested. The Petitioner

---

[10] Further, had he really wanted to test whether the camera was waterproof, the Petitioner could have, for example, tested the device under a running tap or tested it himself in the shower. Jane Doe's involvement in this activity was completely unnecessary.

29

argues that intent should not be considered at all as a relevant factor in this inquiry. See supra Part III.A.1; Mot. at 27-28. He argues that, "[t]o be prohibited under the statute, a visual depiction must involve . . . either actual or simulated sexual acts by or with a minor, or the displaying of a minor's pubic area in a graphically sexual way." Mot. at 30 (emphasis added). However, the meaning of "sexually explicit conduct" under the statute is not so narrow. Several courts have incorporated the intended effect or design of a depiction when determining whether such depiction constitutes child pornography. See supra Part III.A.1. While intent is not dispositive, and many other considerations impact the court's ruling, it would be misguided to turn a blind eye to the video's intended effect, as well as to the factual circumstances surrounding this particular video. See Statement of Facts ¶¶ 3-4. The Petitioner's intent and the context in which he chose to create this video are relevant factors in the court's analysis of whether the video in question is a "lascivious exhibition." However, the other factors, discussed herein and considered by the court, play a large role in the court's conclusions, and ultimately they weigh against the Petitioner as well.

For the reasons above, and after considering all evidence presented to the court, and after taking all possible factors into account, the Petitioner has not shown that "it is more

likely than not that no reasonable juror would have convicted him." Bousley, 523 U.S. at 623 (quoting Schlup, 513 U.S. at 327-28). Instead, a reasonable jury could have found the video to be a "lascivious exhibition of the genitals or pubic area," and convicted the Petitioner of possessing child pornography under 18 U.S.C. § 2252(a)(4)(B). Consequently, the Petitioner's claim that he qualifies for the actual innocence exception to procedural default fails. His procedural default on Grounds One, Two, and Three is not excused. The court, accordingly, **DISMISSES** Grounds One, Two, and Three as procedurally defaulted.

### 4. Additional Conclusion Re Video

Further, in the course of determining whether the actual innocence exception applies, this court also determines that the conduct for which the Petitioner was charged and convicted, possession of the video of Jane Doe naked and in the shower, was criminal under 18 U.S.C. § 2252. The court, therefore, also **DENIES** Grounds One, Two, and Three to the extent they all assert or rely on the Petitioner's claim that his possession of the video was not criminal under 18 U.S.C. § 2252. See Mot. at 25 (Ground One: "[t]he video charged in the indictment does not show a minor 'engaging in' the 'lascivious exhibition of genitals' or other 'sexually explicit conduct[.]'"); id. at 35 (Ground Two: the Petitioner's "guilty plea cannot be considered

31

voluntary and intelligent given his failure to understand that the conduct to which he pled guilty was not a federal crime");[11] id. at 38-39 (Ground Three: "[s]ince the video does not depict sexually explicit conduct constituting child pornography, and the Court did not view the video to determine that it was in fact child pornography, the District Court violated Rule 11(b)(3) by not determining a sufficient factual basis for [the Petitioner's] plea."); see also supra Part III (listing the Petitioner's asserted grounds for § 2255 relief). The court has viewed the video, and the Petitioner's conduct does constitute a federal crime under 18 U.S.C. § 2252.

## B. Jurisdictional Challenge

The Petitioner also contends that the court lacked subject matter jurisdiction over his conviction because "[t]he Indictment and Statement of the Offense charge possession of a specific video that does not fall within the definition established by the relevant statute." Reply at 3. The Petitioner argues that "when the facts are undisputed the [c]ourt has jurisdiction to enter a conviction only when those facts fall

---

[11] As further support for the court's denial of Ground Two, the court notes that the Petitioner testified at the evidentiary hearing on October 17, 2017. The court assessed that, while on the stand, the Petitioner appeared to be intelligent and to fully understand the intricacies of his case. Further, the Petitioner has some college education and significant military training, and he stated in his testimony that he fully understood the proceedings.

within the scope of the statutory prohibition." Id. at 4. He likens the situation at hand to those when courts "vacate[] guilty pleas for conduct that—while nominally charged under a law of the United States—was later determined not to be criminal." Id. (internal quotation marks and citation omitted). To the extent the Petitioner presents a "jurisdictional" challenge to his guilty plea based on his claim that § 2252 does not reach his undisputed conduct, the court **DENIES** such challenge because § 2252 does reach the undisputed charged conduct. See supra Part III.A.3. (determining a reasonable jury could have convicted the Petitioner for possession of child pornography under 18 U.S.C. § 2252(a)(4)(B) based on his possession of the video at issue).

## C. Ineffective Assistance of Counsel

The Petitioner alleges ineffective assistance of counsel as Grounds Four and Five. Such claims are not subject to the procedural default bar. See Massaro v. United States, 536 U.S. 500, 504 (2003). To succeed on his ineffective assistance of counsel claims, the Petitioner "must show (1) that his attorney's performance 'fell below an objective standard of reasonableness' and (2) that he experienced prejudice as a result, meaning that there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Fugit, 703 F.3d at 259

(quoting Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984)). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700. Although the Petitioner withdrew Ground Four, because it relates to the court's analysis regarding the criminality of the charged conduct, the court will address it along with Ground Five.[12]

## 1. Ground Four

As Ground Four, the Petitioner argues that his attorneys' advice to plead guilty to possession of child pornography "without informing him that his conduct was not criminal under the statute" was deficient performance. Mot. at 41. Specifically, the Petitioner faults his attorneys' failure to inform him of, and discuss with him in full, his "complete defense to the charges"—the argument that the video of Jane Doe naked and in the shower did not meet the "lascivious exhibition" requirement. Id. at 41-42. However, as explained herein, this argument was not a "complete defense" to the charges, and a reasonable juror could have found the video of Jane Doe to be a lascivious exhibition. See supra Part III.A.3.

Thus, even assuming that the Petitioner's attorneys acted as he alleges, their conduct did not fall below an objective

_____

[12] At the evidentiary hearing on October 17, 2017, ECF No. 89, the Petitioner withdrew Ground Four. See Proposed Findings of Fact and Conclusions of Law at 1 n.1, ECF No. 90.

34

standard of reasonableness. "Just as '[i]t is certainly reasonable for counsel not to raise unmeritorious claims,' it is equally reasonable for counsel not to advise clients of unmeritorious defenses." Fugit, 703 F.3d at 260 (alteration in original) (citation omitted) (quoting Truesdale v. Moore, 142 F.3d 749, 756 (4th Cir. 1998)). As the Petitioner fails to satisfy the first prong of the Strickland test, Ground Four is meritless.

## 2. Ground Five

As Ground Five, the Petitioner alleges that his counsel provided ineffective assistance by failing to consult with him regarding whether to file an appeal. Mot. at 42-45. To succeed on this claim, the Petitioner must show that "(1) his attorney had a duty to consult under Flores-Ortega; (2) his attorney failed to fulfill his consultation obligations; and (3) he was prejudiced by his attorney's failure to fulfill these obligations." United States v. Poindexter, 492 F.3d 263, 273 (4th Cir. 2007); see Roe v. Flores-Ortega, 528 U.S. 470 (2000).

With respect to the duty prong, attorneys have a constitutional duty to consult with their clients about an appeal when "there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was

35

interested in appealing." Flores-Ortega, 528 U.S. at 480. "In making this determination, courts must take into account all the information counsel knew or should have known," as well as "whether the conviction follows a trial or guilty plea." Id. The latter consideration is a "highly relevant factor . . . because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." Id. Additionally, the court must consider "whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." Id.

As to the prejudice prong, a defendant demonstrates prejudice when he can show "that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." Id. at 484. This is a fact-sensitive inquiry, but "evidence that there were nonfrivolous grounds for appeal or that the defendant in question promptly expressed a desire to appeal will often be highly relevant in making this determination." Id. at 485. Both the duty and prejudice prongs "may be satisfied if the defendant shows nonfrivolous grounds for appeal." Id. at 486 (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)). Showing prejudice does not, however, require a petitioner "to demonstrate that his

36

hypothetical appeal might have had merit." <u>Poindexter</u>, 492 F.3d at 269 (quoting <u>Flores-Ortega</u>, 528 U.S. at 486).

As a preliminary matter, the Petitioner's former attorneys filed affidavits, ECF Nos. 71, 72, and testified before the court at the October 17, 2017 evidentiary hearing. Their statements establish that they did not consult with the Petitioner about an appeal following his sentencing. <u>See</u> G.M. Aff. at 17-18, ECF No. 71; J.M. Aff. at 21, ECF No. 72. The Petitioner must, therefore, show that his attorneys had a duty to consult and that their failure to do so prejudiced him. <u>See</u> <u>Flores-Ortega</u>, 528 U.S. at 480, 484. The Petitioner alleges that his attorneys had a constitutional duty to consult with him about an appeal because a rational defendant would have wanted to appeal. Mot. at 42-43. Specifically, the Petitioner alleges that there was a nonfrivolous ground for appeal, <u>id.</u>, and that he asked his attorneys "to come speak with [him] about an appeal" immediately after his sentencing. Courtade Aff. ¶ 22, Mot. Ex. 1, ECF No. 51-1.

The duty prong may be satisfied if the Petitioner can show that a rational defendant in his position would have wanted to appeal. <u>Flores-Ortega</u>, 528 U.S. at 480. In considering this inquiry, the court begins by discussing the Petitioner's guilty plea. His presentence report ("PSR") includes a written statement by the Petitioner, which sheds some light on his

37

purpose in so pleading: "I truly hope that my acceptance of responsibility and my plea of guilty to this offense will assist in the healing process for all who have been impacted by my conduct." PSR ¶ 20, ECF No. 40. Furthermore, the Petitioner's expectations in pleading guilty were met. He received the statutory maximum for Possession of Child Pornography (Count Two), as the Guidelines range was well above the maximum, and the Production of Child Pornography charge (Count One) was dismissed. See id. ¶ 75; Judgment at 1, ECF No. 48. The Petitioner's plea agreement also included a waiver of his right to appeal his "conviction and any sentence within the statutory maximum . . . (or the manner in which that sentence was determined) on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatsoever." Plea Agreement ¶ 6, ECF No. 27.

Nonetheless, the Petitioner argues that a rational defendant in his position would have wanted to appeal, because his central claim—that his conduct was not criminal—is "unquestionably" a nonfrivolous argument, "as illustrated by appellate decisions rejecting [the] application of § 2252 in similar circumstances." Mot. at 43. In support, the Petitioner refers to cases "holding . . . § 2252 inapplicable to 'voyeurism' or 'mere nudity.'" Id.; compare Larkin, 629 F.3d at 183-84 (determining photos of a child in the shower were "lascivious" because the shower is a sexually suggestive setting

38

and the child was posed unnaturally), with Doe v. Chamberlin, 299 F.3d 192, 196-97 (3d Cir. 2002) (determining that photos of nude girls taking showers at the beach were not "lascivious" because the focal point was not the genitals and the setting was not sexually suggestive). However, any direct appeal the Petitioner may have filed after sentencing would have been subject to the appeal waiver in the Petitioner's Plea Agreement.

Jurisdictional claims are one narrow exception to such an appeal waiver, giving a petitioner the ability to contest whether the court had subject matter jurisdiction over his case. See United States v. Cotton, 535 U.S. 625, 630 (2002) ("[S]ubject-matter jurisdiction . . . involves a court's power to hear a case, [and thus] can never be forfeited or waived."). A federal district court's jurisdiction over a criminal case is established by the Constitution or by federal statute. 18 U.S.C. § 3231; Lamar v. United States, 240 U.S. 60, 64-65 (1916) (Holmes, J.). "Jurisdiction" refers to "a court's power to hear a case," Cotton, 535 U.S. at 630, and to "prescriptions delineating the classes of cases . . . and the persons . . . falling within the court's adjudicatory authority." United States v. Hartwell, 448 F.3d 707, 717 (4th Cir. 2006) (quoting Kontrick v. Ryan, 540 U.S. 443, 455 (2004)). Jurisdictional claims are, by definition, not based upon the merits of a case. "[N]othing can be clearer than that the

district court, which has jurisdiction of all crimes cognizable under the authority of the United States . . . , acts equally within its jurisdiction whether it decides a man to be guilty or innocent under the criminal law, and whether its decision is right or wrong." Lamar, 240 U.S. at 65. Thus, a district court's jurisdiction over a criminal prosecution does not depend upon the guilt or innocence of a defendant under the offense charged.

The Petitioner argues that his central claim is "jurisdictional," and thus that the waiver of his right to appeal in the Plea Agreement does not apply. Mot. at 43; Reply at 3-4, 20-21. The Petitioner states that he does not challenge any of the facts underlying his guilty plea. Id. at 4. Rather, he argues that "when the facts are undisputed the Court has jurisdiction to enter a conviction only when those facts fall within the scope of the statutory prohibition." Id. Further, the Petitioner argues that the undisputed facts in this case do not fall within the scope of the statute, and so the district court was without jurisdiction to convict him. Id. at 2-4.

Non-jurisdictional claims on appeal, such as those based on the underlying question of a defendant's guilt or innocence, are subject to the appeal waiver in the Petitioner's Plea Agreement. See Plea Agreement ¶ 6. The government contends that the Petitioner's "jurisdictional" claim simply goes to the merits of the case, and boils down to an argument "that the elements of

40

the crime could not have been satisfied." Resp. at 9-10. The court agrees with the government's characterization of the Petitioner's "jurisdictional" claim. The Petitioner's framing of his claim as "jurisdictional" is an attempt to circumvent his Plea Agreement and appeal waiver. The Petitioner's claim, essentially, is that he is not guilty of violating the statute under which he was charged. Such a claim is an attack on the sufficiency of the facts to support his conviction, and an attempt to relitigate his guilt. This claim on appeal is of precisely the type that the Petitioner waived in his Plea Agreement.[13]

In conclusion, the Petitioner's "jurisdictional" claim does not undermine this court's subject matter jurisdiction over his prosecution, because it pertains to the merits of his conviction. Thus, this potential claim was waived when the Petitioner waived his "right to appeal the conviction and sentence within the statutory maximum . . . (or the matter in which that sentence was determined) on the grounds set forth in

---

[13] Further, this court did have subject matter jurisdiction over the Petitioner's prosecution. The Superseding Indictment lawfully alleges that the Petitioner's conduct violated federal law. ECF No. 13. Both crimes alleged in the Superseding Indictment (production and possession of child pornography) have been found constitutional and are lawful provisions of the United States Code. See, e.g. United States v. Whorley, 550 F.3d 326, 335-37 (4th Cir. 2008); United States v. Peterson, 145 F. App'x 820, 821-22 (4th Cir. 2005); United States v. Wyatt, 64 F. App'x 350, 351-52 (4th Cir. 2003). Therefore, the court's subject matter jurisdiction is clear.

18 U.S.C. § 3742 or on any ground whatsoever." Plea Agreement ¶ 6. Accordingly, there is no evidence of a nonfrivolous claim that the Petitioner could have brought on direct appeal, nor is there any other evidence to support a finding that a rational defendant would have wanted to appeal. The Petitioner's claim that his attorneys failed to consult with him regarding an appeal, in violation of their duties, is meritless.

Alternatively, the Petitioner may satisfy the duty prong by showing that he "reasonably demonstrated to counsel that he was interested in appealing." Flores-Ortega, 528 U.S. at 480. In determining whether the Petitioner successfully makes this showing, the court relies on the affidavits of the Petitioner and his former attorneys, as well as evidence introduced at the October 17, 2017 evidentiary hearing. See Courtade Aff., Mot. Ex. 1; ECF Nos. 71, 72, 89. For the foregoing reasons, the court **FINDS** that the Petitioner does not show he reasonably demonstrated to his attorneys that he was interested in appealing.

The Petitioner states that he "asked both [of his attorneys] to come speak with [him] about an appeal while the marshals were placing [him] into cuffs." Courtade Aff. ¶ 22, Mot. Ex. 1. However, his attorneys strongly deny that claim. G.M. Aff. at 13 ("That assertion is flagrantly false! Mr. Courtade did not expressly, or otherwise, request counsel to

42

consult with him regarding a direct appeal."); J.M. Aff. at 21 ("This is a false assertion. I did not at any point before, during, or after the sentencing hearing hear Mr. Courtade ask me or [his other attorney] to come see him about an appeal after the hearing."). While testifying at the evidentiary hearing, the Petitioner reiterated that he asked his attorneys to meet with him regarding a direct appeal immediately after sentencing. However, the Petitioner admitted that he did not attempt to contact his attorneys again after that day. The Petitioner did not call anyone after sentencing to discuss filing an appeal. The Petitioner's customary way of contacting his attorneys was through his mother, who frequently engaged in email correspondence with the attorneys. The Petitioner admitted that he never asked his parents to relay a message to his attorneys regarding an appeal, because he did not think an appeal was possible.[14]

Additionally, both of the Petitioner's parents testified at the evidentiary hearing, and provided evidence that the Petitioner did not attempt to pursue an appeal after sentencing. The Petitioner's father stated that the Petitioner told his parents he wanted to meet the attorneys after sentencing, and

---

[14] The Petitioner further testified that he only wanted to appeal after sentencing in order to contest his life term of supervised release. See Judgment at 3. The Petitioner stated that he did not want to appeal his sentence, or argue that his conduct was not criminal under the statute.

43

that they did not show up. However, the Petitioner did not mention that his request was regarding an appeal. The Petitioner's mother stated that the Petitioner never asked her to tell his attorneys to contact him for any reason. The court, therefore, **FINDS** that the only way it is possible that the Petitioner told his attorneys he wanted to appeal after sentencing, is that any such request was made quietly, such that his attorneys were unable to hear. Further, after sentencing, the Petitioner made no effort to follow-up with any request for an appeal by attempting to contact his attorneys for any reason whatsoever. Accordingly, the court **FINDS** that the Petitioner did not reasonably demonstrate to counsel that he was interested in an appeal. Therefore, the Petitioner did not trigger his attorneys' duty to consult with him regarding whether to file an appeal. As such, the court **DENIES** Ground Five.

### IV. CONCLUSION

For the reasons stated herein, the court **DISMISSES** as procedurally defaulted the Petitioner's Grounds One, Two, and Three, and, in the alternative, **DENIES** them on the merits to the extent they all assert or rely on the Petitioner's claim that his possession of the video of Jane Doe was not criminal under 18 U.S.C. § 2252(a)(4)(B). The court also **DENIES** Ground Four, to the extent it relates to the court's ruling on Grounds One, Two and Three, and **DENIES** Ground Five.

44

The Clerk is **DIRECTED** to send a copy of this Opinion to the counsel for the Petitioner and to the United States Attorney at Norfolk.

**IT IS SO ORDERED**.

/s/
Rebecca Beach Smith
Chief Judge
REBECCA BEACH SMITH
CHIEF JUDGE

December 13, 2017